**Abu–Ali ABDUR' RAHMAN**

v.

**Ricky BELL.**

No. 3:96–0380.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 8, 1998.

cer, employee, agent, department, or instrumentality of any State. 16 U.S.C. § 470bb(6).

*MEMORANDUM*

CAMPBELL, District Judge.

## I. *Introduction*

Petitioner, Abu–Ali Abdur' Rahman[1], has been sentenced to death by electrocution for first degree murder. He has filed a Petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging both his conviction and sentence. The Court held an evidentiary hearing in this matter beginning on February 6, 1998. For the reasons set forth below, the Court issues the writ of habeas corpus as to Petitioner's death sentence, but denies issuance of the writ as to Petitioner's conviction.

The basis of the Court's opinion, as is described in detail herein, is that Petitioner was unconstitutionally sentenced to death because he did not receive the effective assistance of counsel guaranteed by the Sixth Amendment. This Court, along with the state post-conviction trial and appellate courts, finds that trial counsel for Petitioner failed to adequately represent their client. This Court further finds that Petitioner was seriously prejudiced by utterly ineffective assistance of counsel at his sentencing hearing. Trial counsel, for instance, failed to investigate and inform the jury about Petitioner's unstable mental history and bizarre family background. The jury, as a result, did not hear significant mitigating evidence before deciding whether to sentence Petitioner to death. This is not to suggest that Petitioner, or anyone with an unstable mental history or bad childhood, cannot be sentenced to death. However, a sentence of death must be imposed in accordance with the Constitution and in this case was not. This is not a case where counsel presented the jury with most of the available mitigation evidence and merely missed some evidence. This is not an instance of harmless error. Despite an abundance of mitigating evidence, there was virtually a complete failure by counsel to present a defense to the jury at Petitioner's sentencing. Accordingly, as is more fully discussed in Section VIII, Ineffective Assistance of Counsel, the Constitution has been

Bradley Alan MacLean, Nashville, TN, William P. Redick, Jr., Whites Creek, TN, for plaintiff.

John H. Baker, III, Nashville, TN, for defendant.

---

**1.** Petitioner has changed his name from James Lee Jones to Abu–Ali Abdur' Rahman.

violated and the writ of habeas corpus must issue as to Petitioner's death sentence.

## II. *Proceedings in the State Courts*

Petitioner was tried and convicted of first degree murder, assault with intent to commit murder, and armed robbery. (Addendum 1, at 2000). After a subsequent sentencing hearing, Petitioner received the death penalty for the first degree murder conviction. The jury found the existence of three aggravating circumstances: (1) Petitioner had been convicted of prior violent felonies (assault with a deadly weapon and second degree murder); (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (3) the murder was committed while the Petitioner was engaged in committing or attempting to commit a first degree murder or robbery. (Addendum 1, 1986–2001). The court sentenced the Petitioner to life on each of the other offenses, to be served consecutively to each other. (Addendum 1, at 13–14).[2]

Petitioner was represented at trial by Lionel Barrett and Sumter Camp. After trial, Mr. Barrett and Mr. Camp withdrew, and the state court appointed Richard Dinkins to represent Petitioner on direct appeal to the Tennessee Supreme Court. (Addendum 1, Technical Record, at 87). The Tennessee Supreme Court affirmed Petitioner's conviction and sentence. *State v. Jones,* 789 S.W.2d 545 (Tenn.1990).

The state court appointed another attorney to assist Mr. Dinkins in the post-conviction proceedings, who was joined by a volunteer lawyer from the Capital Case Resource Center. (Addendum 11, Technical Record, at 23, 50, 82). The post-conviction trial court found trial counsel had been ineffective in their representation of Petitioner at sentencing. (Addendum 11, at 81–109). The court, however, went on to find that trial counsel's deficiencies did not result in prejudice to the Petitioner and rejected all other claims. (*Id.*) The Tennessee Court of Criminal Appeals[3] affirmed that judgment, and the Tennessee Supreme Court denied Petitioner's

application for permission to appeal. *Jones v. State,* 1995 WL 75427, at *2 (Tenn.Crim. App. Feb.23, 1995).

The post-conviction trial court gave the following summary of facts in its opinion:

The facts are that petitioner and his codefendant, Harold Deval Miller, went to the victims home. Petitioner wants to describe the events that took place after that as a misguided attempt to rid the community of drug dealers, as it appears that the victim, Patrick Daniels, was a small time marijuana dealer. Codefendant, Mr. Miller, testified for the State, however, and he described the motive for the visit as robbery. The victim, Patrick Daniels, lived with Norma Norman. Petitioner and Miller entered the home and bound Daniels and Norman. What happened next is described in the appellate decision.

The victim in this case was bound, gagged, and blind folded with duct tape. He was distressed, crying, and begging not to be hurt. Defendants stood over him and stabbed him six (6) times, four (4) times penetrating the heart. He then watched as the victim went into convulsions, blood spewing from his nose and mouth. His accomplice testified, "he was working himself up on a rhythm," he was "cool" and "under control." The victim continued to plead with the defendant as he was being stabbed.

*State v. Jones, supra,* at 550. The defendant also stabbed Norma Norman numerous times, but she miraculously survived the attack.

(Addendum 11, 83–84).

## III. *Proceedings in this Court*

Prior to the evidentiary hearing in this case, the Court denied Petitioner's motion for summary judgment on his claims that the trial court's sentencing instructions regarding the heinous, atrocious, or cruel aggravating circumstance, and unanimity (Amended Petition, ¶¶ C7(1), (4), C8) were unconstitu-

---

**2.** The court also determined that, if the death sentence were to later be reduced to a life sentence, that sentence would be served consecutively to the other life sentences. (Addendum 1, at 14). In addition, the state sentences would be served consecutively to the federal sentence for

which Petitioner was on parole when he was convicted of the state offenses. (*Id.*)

**3.** The panel consisted of only two judges, rather than the usual three judges.

tional. (Docket Nos. 123, 124). The Court granted summary judgment to the Respondent on the following claims: the *Batson* challenge (Amended Petition, at ¶ C2(2)); exclusion of jurors based on religious beliefs (¶¶ C2(3), (4)); failure to exclude certain jurors for cause (¶ C2(5)); sufficiency of evidence of robbery and first degree murder (¶ C3); inadequate proportionality review (¶ C9); prosecutor's questions during guilt phase (¶ D4); prosecutorial misconduct involving publication of indictments to jury (¶ D6); cross examination of Petitioner at sentencing (¶ D7); and State's argument at sentencing regarding the Southeastern Gospel Ministry (¶ D8(4)). (Docket Nos. 156, 157). The Court denied summary judgment on Petitioner's conflict of interest and ineffective assistance of counsel claims, having found the existence of a factual dispute. (*Id.*) The Court denied Respondent's motion for summary judgment on procedural default issues because Petitioner raised factual issues regarding actual innocence in response to the motion. (Docket Nos. 133, 134).[4]

## IV. *Procedural Defenses*

### A. *Generally*

Respondent argues that the Court should not reach the merits of several of Petitioner's claims because Petitioner failed to raise those claims in state court, and has, therefore, procedurally defaulted those claims. Petitioner argues that none of his claims are procedurally defaulted because: (1) all the claims Petitioner raises have been presented to the state courts; (2) the ineffectiveness of Petitioner's counsel in the state courts and prosecutorial misconduct provide cause for any failure to raise a claim; and (3) Petitioner is actually innocent of the crime for which he has been convicted, and of the death penalty.

■ Subsections (b) and (c) of 28 U.S.C. § 2254 require a habeas corpus petitioner to exhaust the remedies available to him in

state court before raising claims in federal court. If the petitioner has no remedy currently available in state court, however, the exhaustion requirement is satisfied. *Gray v. Netherland,* 518 U.S. 152, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996); *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 1068–69, 103 L.Ed.2d 334 (1989).

■ Although a claim may be fully exhausted under these circumstances, the petitioner's failure to assert the claim in state court may constitute procedural default. *Id.* As a general rule, procedural default bars the petitioner from raising claims in a federal habeas corpus proceeding that he failed to raise in state court. *Id.* A petitioner may avoid this procedural bar by showing cause for the default, and that prejudice resulted from the default, or by showing that he is actually innocent. *Id.; Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

### B. *Exhaustion*

■ First, Petitioner argues that his claims are not procedurally defaulted because they have all been exhausted. Exhaustion requires that petitioners "fairly presen[t]" federal claims to the state courts to provide them with an opportunity to correct alleged violations of its prisoners' federal rights. *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). A claim has been "fairly presented" if the petitioner identified the specific constitutional guarantee allegedly violated, as well as a statement of the facts which entitle the petitioner to relief. *Gray,* 116 S.Ct. at 2081.

It is not enough to make a general reference to a constitutional guarantee as broad as due process to present the substance of such a claim to a state court. *Gray,* 116 S.Ct. at 2081.

Petitioner argues that many of his claims[5] are exhausted because the Tennessee Su-

---

4. Respondent also filed a Motion in Opposition to an Evidentiary Hearing (Docket No. 110), which the Court denied. (Docket No. 116).

5. Those claims are as follows: whether the indictments against Petitioner violated his Fifth, Eighth and Fourteenth Amendment rights (Amended Petition, ¶ C1); whether Petitioner was denied his rights under the Sixth, Eighth

and Fourteenth Amendments because he was not permitted to question potential jurors in voir dire regarding their beliefs about parole eligibility (¶ C2(1)); whether the evidence was sufficient to support Petitioner's conviction of assault (¶ C3(3)); whether the trial court erred in instructing the jury that it could return a verdict finding Petitioner guilty of either premeditated murder, felony murder, or both (¶ C4(1)); wheth-

preme Court had the independent duty to review each claim that could be based upon the record on appeal even if the claim was not raised by the Petitioner. Petitioner cites Tennessee Code Annotated Section 39-2-205(a), which was in effect at the time of Petitioner's trial, to support his argument.

That statute provided for automatic direct review by the Tennessee Supreme Court where the death penalty has been imposed. Tenn.Code Ann. § 39-2-205(a). The statute required that the court review the death sentence to determine: (1) whether the sentence was imposed in an arbitrary fashion; (2) whether the evidence supported the findings of an aggravating circumstance(s); (3) whether the evidence supported the finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance(s) so found; and (4) whether the death sentence is disproportionate to the penalty imposed in similar cases. Tenn.Code Ann. § 39-2-205(c) (repealed and replaced by Tenn.Code Ann. § 39-13-206(c)(1)).

■ The Court is not persuaded that this statute excuses the requirement that the Petitioner present issues to the state courts in the first instance, at least with respect to issues not specifically delineated in the statute. Accepting Petitioner's argument would essentially eviscerate the exhaustion requirement because defendants would have no incentive to raise issues in the state court. The exception Petitioner advocates would

also undermine the principles of comity and federalism upon which the exhaustion requirement is based. *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2554-55, 115 L.Ed.2d 640 (1991). Accordingly, the statutory requirement that the Tennessee Supreme Court review a death sentence does not satisfy the exhaustion requirement as to those issues not addressed in the statute.[6]

■ Petitioner argues that the exhaustion doctrine does not require a petitioner to seek discretionary review of a claim before the state's highest court. Petitioner argues that presentation of claims to the Tennessee Court of Criminal Appeals on appeal of the denial of his post-conviction petition was sufficient for purposes of exhaustion because that was the last court to which he was entitled to appeal as of right. Although there is a split of authority on the issue, *see Dolny v. Erickson*, 32 F.3d 381, 383-84 (8th Cir.1994) (and cases cited therein), the Sixth Circuit has held that a petitioner must seek discretionary review of a claim from a state's highest court in order to satisfy the exhaustion requirement. *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir.1993). That the Tennessee Supreme Court exercises only discretionary review of post-conviction matters, therefore, does not excuse the Petitioner from raising his claims before that court.[7]

■ Petitioner argues other claims are exhausted for various reasons. First, Petitioner argues that he has exhausted his claim

er voir dire, arguments and instructions to the jury unconstitutionally defined the elements of premeditation and deliberation in a manner that violated Tennessee law (¶ C4(2)); whether the trial court erred instructing the jury regarding lesser included offenses (¶ C4(3)); whether the trial court erred by failing to instruct the jury that accomplice testimony must be corroborated by independent evidence (¶ C4(4)); whether the trial court gave an erroneous definition of reasonable doubt in its instructions to the jury by use of the language "moral certainty" (¶ C4(5); ¶ C7(3)); whether Tennessee law unconstitutionally prohibits presentation of certain specified issues at a capital sentencing hearing (¶ C5); whether the trial court unconstitutionally instructed the jury regarding the felony murder aggravating circumstance (¶ C7(2), ¶ C8); whether the trial court unconstitutionally instructed the jury that sympathy could not be a factor in its sentencing decision (¶ C7(5)); whether the sentencing instructions as a whole were unconstitu-

tional (¶ C6); whether jury instructions regarding mitigating circumstances at the sentencing phase of the trial were unconstitutional (¶¶ C7(6), (7), (8), (9), (10), (11), (12), (13), (14), (15)); whether the Tennessee Death Penalty Statute is unconstitutional (¶ C10); whether the prosecution made improper closing argument at the guilt phase of trial regarding the term "pure pleasure" (¶ D5(4)); and whether the prosecution's argument during sentencing violated Petitioner's constitutional rights (¶¶ D8(1)-(3), (5)-(8)).

6. Respondent does not allege that Petitioner's claims that track the statute are procedurally defaulted.

7. Petitioner contends that his ineffective assistance of appellate counsel claim (Amended Petition, ¶ F) is exhausted based on this argument. Given the Court's rejection of this argument, the exhaustion doctrine applies to bar this claim.

that the evidence at trial was insufficient to support his conviction of assault by presenting it to the Tennessee Supreme Court in his application for discretionary review. (Amended Petition, ¶ C3(3)). Petitioner contends that he presented this claim to the court because it is related to his argument that the evidence was insufficient to support premeditation and deliberation, in that both claims involve Petitioner's condition at the time of the offense. The Court is not persuaded, however, that this claim was fairly presented to the court simply because Petitioner's mental state was a basis for both claims. Thus, Petitioner's sufficiency of the evidence supporting assault claim has not been exhausted.

█ With respect to his claim that voir dire, arguments and instructions to the jury unconstitutionally defined the elements of premeditation and deliberation (Amended Petition, ¶ C4(2)), Petitioner argues that he raised the substantial equivalent of this claim by arguing that the evidence was insufficient to support a finding of premeditation or deliberation under *State v. Brown*, 836 S.W.2d 530 (Tenn.1992), a case involving jury instructions on these elements. Resolving a sufficiency of the evidence claim, however, does not require a court to determine whether the court erred in its jury instructions. This claim was not fairly presented to the state court, and therefore, has not been exhausted.

█ Petitioner next argues that he has exhausted his claim that the trial court erred by failing to instruct the jury that accomplice testimony must be corroborated by independent evidence (Amended Petition, ¶ C4(4)). Petitioner contends that he raised the substantial equivalent of this claim by arguing to the Tennessee Supreme Court on direct appeal that it was fundamentally unfair to predicate his first degree murder conviction solely on the basis of the uncorroborated testimony of codefendant Harold Devalle Miller. But, as stated above, resolving Petitioner's fundamental fairness claim would not require the court to review the jury instructions on this particular issue. Accordingly, this claim was not fairly presented to the state courts, and has not been exhausted.

█ Petitioner argues that his claim challenging the constitutionality of the Tennessee Death Penalty Statute (Amended Petition, ¶ C10) was raised on direct appeal to the Tennessee Supreme Court, because he stated in his brief:

> D. *As Applied To The Facts Of This Case, The Imposition Of The Death Penalty Constitutes A Deprivation Of Due Process Of Laws, Equal Protection Of Laws And Cruel And Inhuman Treatment In Violation Of The Fifth, Eighth And Fourteenth Amendments To The United States Constitution And Article I, Sections Eight And Sixteen Of The Tennessee Constitution And, Further, Is Disproportionate To The Sentence Imposed In Similar Cases*
>
> In addition to the arguments set forth in Section II A, B, C and D, *supra*, defendant submits that, taking this case as a whole, the imposition of the death penalty was improper and constitutes a deprivation of life without due process of law and cruel and inhuman treatment . . .

(Brief of the Appellant, at 59 (Addendum 2)). The brief then goes on to address the proportionality issue.

Despite the language in the heading, the brief does not specify, "as applied to the facts of this case," why the death penalty statute is unconstitutional, and what facts support the constitutional challenge. Under these circumstances, the Court concludes that Petitioner did not fairly present his constitutional challenge to the Tennessee Supreme Court on direct appeal.

█ Petitioner also points out that he challenged the "heinous, atrocious and cruel" aggravating circumstance in his post-conviction application for permission to appeal to the Tennessee Supreme Court. In a footnote, the brief states: "By discussing only the aggravating circumstance of 'heinous, atrocious or cruel,' *infra*, the Appellant does not waive any previously raised constitutional challenges. The Appellant relies on the arguments previously advanced and ruled upon in his Brief to the Court of Criminal Appeals." (Application For Permission To Appeal, at 21 n. 11 (Addendum 15)).

Although the Petitioner referred, in this footnote, to the brief he filed in the Court of Criminal Appeals, he did not attach a copy of that brief to the Application. The Court is not persuaded that referral to arguments made in another document by way of a footnote constitutes a fair presentation of those arguments to the Tennessee Supreme Court. Thus, the Court concludes that this claim has not been exhausted.

■ In his Amended Petition, Petitioner alleges a number of instances of prosecutorial misconduct, numbered one through eight, with several subissues under each number. In a paragraph under the main heading "Prosecutorial Misconduct," Petitioner states that the prosecution "pursued a consistent course of deception," which violated Petitioner's constitutional rights (Amended Petition, (¶ D)). Respondent has asserted a procedural default defense to most of the claims set forth under this heading.

Petitioner argues, however, that the heading "prosecutorial misconduct," along with the paragraph following that heading, constitute a separate claim to which the Respondent has not asserted a procedural default defense. But the Court does not view this paragraph as a separate claim. The paragraph does not allege specific constitutional violations, nor does it set forth specific facts in connection with those alleged violations. Therefore, Respondent will not be considered to have waived his procedural default defense to the prosecutorial misconduct claims.

For this same reason, the Court rejects Petitioner's argument that certain specific allegations are not defaulted because they fall within this general prosecutorial misconduct claim.[8]

■ Petitioner contends that his claims regarding the failure to disclose codefendant Miller's pretrial statements (Amended Petition, ¶¶ D1(2)–(4)) were fairly raised to the Tennessee Supreme Court in his application for permission to appeal because, in that application, he argued that the prosecution made misleading statements in its argument to the jury. (Application For Permission To Appeal, at 9 (Addendum 15)). The Petitioner also argued that the prosecution committed discovery violations, but did not mention Miller's pretrial statements.

The Court is not persuaded that this discovery violation claim has been fairly presented to the Tennessee Supreme Court. Determining whether a prosecutor has made a misleading closing argument is not the same as determining whether the prosecution committed a discovery violation. Thus, Petitioner has not exhausted this claim.

■ Petitioner next contends that he has exhausted his claim that the prosecution provided misleading statements to the Middle Tennessee Mental Health Institute ("MTMHI"). (Amended Petition, ¶ D2(2)). Petitioner argues that he raised this claim in his application for permission to appeal to the Tennessee Supreme Court by reciting the facts upon which the claim is based. Although Petitioner discussed the prosecutor's letter to MTMHI in the "Statement of the Facts" section of the application, he did not raise this issue in arguing that the prosecution had engaged in misconduct. (Application For Permission To Appeal, at xii–xiii, 7–19 (Addendum 15)). The prosecutorial misconduct claims presented to the Tennessee Supreme Court were limited to Petitioner's allegations that the prosecution failed to disclose certain documents in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the prosecution made a misleading closing argument. (*Id.*) Although Petitioner alleged facts regarding

---

8. These claims include: whether the prosecution should have disclosed the statements of Norman's children (¶ D1(5)), the redacted portion of Detective Garafola's Report (¶ D1(6)), other police reports (¶ D1(8)), the memorandum in the prosecution's file concerning a bank account in Patrick Daniels' name (¶ D1(9)), the statement of George Daniels/laboratory reports (¶¶ D1(10)(11)), and information regarding Petitioner's bank account (¶ D1(12)). These claims also include whether the prosecution unconstitutionally influenced Harold Devalle Miller's testimony (¶ D2(1)); whether the prosecution provided false information to MTMHI (¶ D2(2)); whether the prosecution improperly attempted to manipulate Norma Norman's testimony (¶ D2(3)); whether the prosecution unconstitutionally misled defense counsel regarding Petitioner's 1972 murder conviction (¶ D3); whether the prosecution made improper closing arguments at the guilt phase of trial (¶¶ D5(1)–(4)); and whether the prosecution's argument during sentencing violated Petitioner's constitutional rights (¶¶ D8(1)–(3), (5)–(8)).

the prosecution's letter to MTMHI, he did not identify the constitutional violation allegedly shown by those facts. Thus, this claim was not fairly presented to the Tennessee Supreme Court, and has not been exhausted.

■ Respondent argues that Petitioner's ineffective assistance of counsel claim is procedurally defaulted except as to the claim that defense counsel conducted a deficient investigation of Petitioner's mental history (Amended Petition, ¶¶ E1–E2(g)). Petitioner raised the ineffective assistance of counsel claim in his post-conviction petition, and described twenty-seven alleged deficiencies by defense counsel. (First Amended Petition For Post–Conviction Relief, at 3–6 (Addendum 11)). As noted above, the trial court held that defense counsel conducted an inadequate investigation of Petitioner's background and mental health history, but determined that Petitioner was not prejudiced by that deficiency. (Memorandum and Order of the Fifth Circuit Court For Davidson County (Addendum 11)). The Court of Criminal Appeals agreed with that assessment. *Jones v. State,* 1995 WL 75427 (Tenn.Crim.App. Feb.23, 1995).

In his application for permission to appeal to the Tennessee Supreme Court, Petitioner argued that prejudice had been shown. (Application For Permission To Appeal, at 1–6 (Addendum 15)). Because Petitioner succeeded in demonstrating that trial counsel's performance was deficient in the lower courts, it was not necessary for the Petitioner to raise all those deficiencies again in

arguing that his appeal of the prejudice issue should be accepted. The Court concludes that Petitioner fairly presented the ineffective assistance of counsel claims to the Tennessee Supreme Court.[9]

In conclusion, the only claims that have been exhausted by Petitioner and remain to be decided by this Court are: Petitioner's prosecutorial misconduct claims involving certain lab reports and the transcript from Petitioner's 1972 murder trial (Amended Petition, ¶¶ D1(1), (7)), and Petitioner's claim that his trial counsel provided constitutionally ineffective assistance (Amended Petition, ¶¶ A, E1–E2(g)).[10] With the exception of these claims, Petitioner has failed to exhaust all the claims to which Respondent has asserted a procedural default defense. Petitioner may no longer present those claims to the state court, however, because they would be barred by the statute of limitations. *See* Tenn.Code Ann. § 40–30–202.[11] Thus, because Petitioner has no remedy currently available in state court, these claims are procedurally defaulted. *See Hannah v. Conley,* 49 F.3d 1193, 1196–97 (6th Cir.1995).

## C. *Cause and Prejudice*

■ Petitioner argues that even if his claims are the subject of procedural default, the default should be excused because he can establish cause for the default, and that prejudice resulted from the default. Petitioner also argues that the default should be excused to prevent a fundamental miscarriage of justice in that he is actually innocent.[12]

9. For the same reason, the Court also concludes that Petitioner has exhausted his claim that trial counsel failed to test the adversarial process. (Amended Petition, ¶ A).

10. Respondent has asserted a procedural default defense as to Petitioner's claim that the cumulative effect of all errors at trial violated Petitioner's due process rights. (Amended Petition, ¶ B). In his brief, Petitioner indicates that this is not a separate claim for habeas relief, but is an argument to be considered in determining whether the state court's alleged errors should be considered harmless. Therefore, the Court will not consider this argument as a separate claim.

11. Section 40–30–202(a) is part of the PostConviction Procedure Act of 1995, Tenn.Code Ann. §§ 4030201, *et seq.* With some exceptions not applicable here, Section 202(a) provides that a petition for post-conviction relief must be brought within one year of the date of the final

action of the highest state appellate court to which an appeal is taken. The previous postconviction statute required that a petition be filed within three years of the date of the final action of the highest state appellate court to which an appeal was taken. Tenn.Code Ann. § 40–30–102 (repealed 1995).

The Tennessee Supreme Court denied Petitioner's petition to rehear, on direct appeal, on May 14, 1990. (Addendum 7). Therefore, Petitioner would be barred, under either statute, from seeking to raise these claims through a post-conviction proceeding in state court.

12. Petitioner also argues that certain state procedural rules should not prevent adjudication of claims by this Court. It does not appear, however, that Respondent relies on state procedural rules to bar Petitioner's claims. Instead, Respondent argues that the claims at issue were not raised at all in the state courts. *See Teague,* 109

In order to establish cause, a petitioner must show the procedural default was the result of ineffective assistance of counsel, or "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). A petitioner may rely on ineffective assistance of counsel to establish cause only if he has presented that claim to the state courts as an independent constitutional claim, and he shows that counsel's incompetence rises to the level of a constitutional violation. 106 S.Ct. at 2645–46.

In order to demonstrate that an objective impediment provided cause for a procedural default, a petitioner may show, for example, that "the factual or legal basis for a claim was not reasonably available to counsel," or that " 'some interference by officials' " made compliance with the procedural rule impracticable. *Murray,* 106 S.Ct. at 2645 (citations omitted).

The cause and prejudice standard applies to claims that were defaulted on appeal as well as those defaulted at trial. *Murray,* 106 S.Ct. at 2646.

In this case, Petitioner has presented an independent ineffective assistance of trial counsel claim that is not procedurally defaulted. Petitioner has not specified, however, any errors made by trial counsel that prevented any issues from being raised on appeal. In other words, in reviewing Petitioner's case on direct appeal, the Tennessee Supreme Court did not dismiss any of Petitioner's claims based on the failure of trial counsel to preserve those issues at trial. *See State v. Jones,* 789 S.W.2d 545 (Tenn.1990).

Petitioner may not establish cause by alleging the ineffectiveness of appellate counsel in failing to present certain issues on appeal because this claim has not been presented to the state courts. (*See* Footnote 7, and accompanying text).[13]

Finally, Petitioner may not establish cause by alleging that postconviction counsel were ineffective in failing to raise certain issues to the state courts. There is no constitutional right to an attorney in state postconviction proceedings, and therefore, a petitioner cannot claim constitutionally ineffective assistance of counsel regarding those proceedings. *Coleman,* 111 S.Ct. at 2566.[14]

Petitioner also argues *that* cause is established by the "widespread prosecutorial abuse and judicial bias" which tainted the trial and prevented post-conviction counsel from gaining "an adequate picture of the circumstances surrounding the crime and Petitioner's life." (Petitioner's Memorandum In Response To Respondent's Summary Judgment Motions And In Support Of An Evidentiary Hearing, at 50 (Docket No. 113)). Petitioner does not, however, specify how failure to raise a particular claim on direct appeal or during the post-conviction proceeding was impeded by the prosecution or the state court trial judge. Under these circumstances, the Court is not persuaded that an objective impediment prevented Petitioner from presenting claims to the state courts.

In conclusion, Petitioner has not demonstrated cause for his procedural default. Consequently, the Court need not determine whether prejudice resulted from the procedural default.

### D. *Actual Innocence*

A petitioner who is unable to demonstrate cause and prejudice for a procedural default may nonetheless avoid a procedural default bar by demonstrating that he is actually innocent. *Murray,* 106 S.Ct. at 2649. In order to fall within the actual innocence exception to the procedural default bar, a petitioner must provide evidence that negates an element of the crime for which he

---

S.Ct. at 1069; *Coleman v. Thompson,* 111 S.Ct. at 2557 n. 1.

**13.** In any event, the Court notes that a defendant does not have a constitutional right to have every nonfrivolous issue raised on appeal. *See Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 3312–14, 77 L.Ed.2d 987 (1983).

**14.** Furthermore, Petitioner has stated that he "is no longer pursuing the issue of ineffective assistance of post-conviction counsel." (Petitioner's Response To Motion To Compel Disclosure Of Documents From His State Court *Attorneys'* Files, at 2 (Docket No. 140)).

was convicted, or demonstrates that he was not eligible for the death penalty under the applicable state law. *Sawyer v. Whitley*, 505 U.S. 333, 112 S.Ct. 2514, 2521–22, 120 L.Ed.2d 269 (1992).

A petitioner who claims he is actually innocent of the crime for which he was convicted must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 115 S.Ct. at 867 (quoting *Murray v. Carrier*, 106 S.Ct. at 2649–2650). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* This standard requires "a stronger showing than that needed to establish prejudice." *Id.* (footnote omitted).

To be credible, this claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 115 S.Ct. at 865.

In order to establish actual innocence of the death penalty, a petitioner must provide "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner" eligible for the death penalty under the applicable state law. *Sawyer*, 112 S.Ct. at 2517. In order to make this showing, the petitioner must focus on those elements which render a defendant eligible for the death penalty, *e.g.*, aggravating circumstances, and not on additional mitigating evidence that was not introduced at sentencing. *Sawyer*, 112 S.Ct. at 2523.

Petitioner claims he is actually innocent of first degree premeditated murder based on (1) the testimony of a forensic pathologist regarding blood splattering at the scene of the stabbings; (2) the testimony of a psychi-

atric expert that Petitioner was insane at the time of the stabbings, and lacked the capacity to deliberate and premeditate; and (3) the lack of credibility of the testimony of the co-defendant, Harold DeValle Miller. Petitioner also claims he is actually innocent of felony murder because there was insufficient proof of the underlying felony—theft.[15]

First, Petitioner argues that certain blood splattering evidence supports his claim of actual innocence. At the hearing in this Court, Petitioner presented the testimony of Dr. Kris Sperry, a forensic pathologist, who opined that the assailant would have had blood from the victims' wounds splattered on his body and his clothing. (Transcript of Hearing Beginning on February 6, 1998 ("Transcript"), at 37–38, 77). Petitioner points out, however, that crime lab reports indicate there were no blood stains found on clothes, a coat and two pair of work pants, seized from the Petitioner's apartment two days after the stabbings. (Lab Report, Petitioner's Exhibit 117; Search Warrant, Petitioner's Exhibit 115).

On the other hand, there is no evidence that during the stabbings, Petitioner was wearing the clothes later seized from his apartment. Norma Norman testified that Petitioner was wearing a black coat when he arrived at the apartment. (Addendum I, at 1342–1343). Because Petitioner taped her eyes before the stabbings were committed, however, she could not testify that he was wearing the coat during the stabbings. (Addendum I, at 1375–1378). There was no evidence that he was wearing one of the two pair of pants seized from his apartment two days after the stabbings, or that he had not disposed of the pants worn during the crime.[16]

Although this evidence may have provided a good argument for defense counsel to raise to the jury, the Court is not convinced that

---

**15.** Although he mentions it in his brief, Petitioner does not appear to have asserted a freestanding actual innocence claim (that execution of one who is actually innocent violates the Eighth Amendment) in his Amended Petition. In any event, the standard for this claim is even higher than that set forth in *Schlup*. Therefore, the Court is not persuaded that Petitioner has established actual innocence as a separate claim.

*Schlup*, 115 S.Ct. at 860–62; *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *Carriger v. Stewart*, 132 F.3d 463, 476–77 (9th Cir.1997).

**16.** Petitioner's failure to dispose of his coat may be explained by his fondness for the coat, which was given to him by his wife as a birthday gift. (Addendum I, at 1454–1455).

reasonable jurors probably would not have convicted Petitioner if they had been presented with this evidence.

Moreover, both Dr. Sperry and Petitioner conveniently overlook the fact that Petitioner admitted that he was guilty at the sentencing phase of the trial:

> ... But what I am saying is, I'm going to submit to the fact that I am the individual that committed these particular felonies or assaults upon these two people. But I don't remember—you know, I don't remember too much of why that all of a sudden came to me. All I know is that I'm the man that stabbed Mr. Daniel Patricks (sic) and I'm the man that assaulted Ms. Norma Jean Norman.

(Addendum I, at 1865).

> The only thing that I can recollect is that, when I was over there on this young lady and realized that what I was doing—I had stopped. The purpose to me, you know, I didn't want—go over there to hurt nobody. But it was her that I seen underneath me that made me stop. And God spared her life. And after that I left.

(Addendum I, at 1866–67).

> Q. And you heard Mr. Miller testify from the very seat that you're in right now, that you were the man who stabbed Mr. Daniels to death. And you knew it when you were setting there, that that was true, didn't you?
>
> A. That I was the man, yes.

(Addendum I, at 1893. See also Addendum I, at 1894, lines 7–10; 1957, lines 18–19; 1961, lines 22–25; 1968, lines 19–23).

Next, Petitioner argues that the testimony of Dr. Robert Sadoff supports his claim of actual innocence. Dr. Sadoff opined that, at the time of the stabbings, Petitioner was insane because he lacked the substantial capacity to conform his conduct to the requirements of the law. (Transcript, at 523–524).[17] Dr. Sadoff testified that Petitioner was suffering from Post–Traumatic Stress Disorder, which is a mental illness. (Transcript, at 455, 457). Dr. Sadoff also diagnosed Petitioner as having a Borderline Personality Disorder, a mental disorder. (*Id.*)

The Court is not persuaded that Dr. Sadoff's testimony is sufficient to meet the *Schlup* actual innocence standard. First, Dr. Sadoff's diagnosis comes almost twelve years after the crime, and Dr. Sadoff admitted that the passage of time made it more difficult for him to render a diagnosis. (Transcript, at 584–585). On the other hand, a mental evaluation of the Petitioner conducted shortly after the stabbings found that Petitioner was competent to stand trial, and that an insanity defense could not be supported. (Petitioner's Exhibit 150). The evaluation was performed by the staff of MTMHI after observing the Petitioner over a thirty-day period in residence. (*Id.*) Dr. Craddock, who was a member of the MTMHI team that evaluated Petitioner, testified at the hearing in this case. (Transcript, at 83–163). Although the MTMHI staff did not possess all the Petitioner's previous institutional records at the time they made their diagnosis, that diagnosis should not be given less weight than one made twelve years later.

In addition, Dr. Sadoff's opinion is based primarily on Petitioner's claim that he could not remember the stabbings. (Transcript, at 569). Consequently, Dr. Sadoff opined that Petitioner was probably "dissociating" at the time of the stabbings. (Transcript, at 517–518). As a result, according to Dr. Sadoff, if Petitioner was dissociating, he lacked substantial capacity to conform his conduct to the requirements of the law, or to engage in premeditation and deliberation. (Transcript, at 523–524, 564).

But Petitioner has not always professed an inability to recall the stabbings. The MTMHI records indicate that Petitioner stated he "remembers everything that happened" at the time of the stabbings. (MTMHI Staff Conference Report dated February 19, 1987, Petitioner's Exhibit 150; Transcript, at 97). Nor has Petitioner adhered to the same story. Shortly after his arrest, Petitioner claimed that a third party, Sam Blackstock, was involved in the stabbings. (Transcript, at 210–212). That story turned out to be false. (*Id.*) Finally, although Petitioner insists that the Court

---

**17.** This was the applicable standard for establishing an insanity defense under Tennessee law at the time of Petitioner's trial. *See, e.g., State v. Clayton,* 656 S.W.2d 344, 346 (Tenn.1983).

should not rely on Petitioner's testimony during the sentencing hearing, Petitioner clearly admitted his guilt at that time. (Addendum I, at 1865–1867; 1893–1894; 1957; 1961; and 1968). Because Dr. Sadoff's opinion strongly relies on the questionable, self-serving statements of the Petitioner, the Court does not attach a great deal of weight to that opinion.[18]

■ Petitioner also argues that he is actually innocent because the testimony of codefendant Miller, which indicated that Petitioner committed the stabbings pursuant to a preconceived plan, is not credible. But this argument is not supported by any "new" evidence, as contemplated by *Schlup*, 115 S.Ct. at 865. *See also McCoy v. Norris*, 125 F.3d 1186, 1190–91 (8th Cir.1997). Furthermore, the Court is not persuaded that pointing out every inconsistency in Miller's testimony would have led the jury to change its verdict. *See Sawyer*, 112 S.Ct. at 2524 (evidence "brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness'] account of petitioner's actions"). In other words, Petitioner has failed to show that "no reasonable juror" would have voted to find him guilty in light of Miller's credibility problems.

■ Petitioner also fails to present new evidence regarding the robbery. Instead, Petitioner argues that none of the witnesses saw the Petitioner take $300 from the apartment, and that it was just as plausible, based on the evidence, that someone else had taken the money. As the Court has determined in a previous Order (Docket Nos. 156, 157), although the evidence was circumstantial, it was still sufficient to allow the jury to find the elements of robbery beyond a reasonable doubt. Consequently, Petitioner has failed to show that "no reasonable juror" would

have voted to find him guilty in light of Petitioner's arguments regarding the lack of sufficient evidence.

■ Petitioner also argues that this new evidence also shows he is actually innocent not only of the crime, but also of the death penalty. As discussed above, the *Schlup* Court has pointed out that the standard for establishing actual innocence of the death penalty, set forth in *Sawyer*, is stricter than that required to show actual innocence of the capital crime. The stricter standard requires Petitioner to provide clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found him eligible for the death penalty. For the reasons explained above, the Court concludes that Petitioner has not shown actual innocence of the death penalty.

Because Petitioner has not established cause and prejudice, or actual innocence, he may not avoid the procedural default of the claims to which Respondent has asserted a procedural default defense. Accordingly, the Court will only address the following claims: Petitioner's prosecutorial misconduct claims involving certain lab reports and the transcript from Petitioner's 1972 murder trial (Amended Petition, ¶¶ D1(1), (7)), and Petitioner's claim that his trial counsel provided constitutionally ineffective assistance (Amended Petition, ¶¶ A, E1–E2(g)).

**V. *The Trial Court's Instructions Regarding the "Heinous, Atrocious or Cruel" Aggravating Circumstance and Unanimity***

Prior to the hearing in this case, the Court denied Petitioner's motion for summary judgment on his claims that the trial court's sentencing instructions regarding the heinous, atrocious, or cruel aggravating circumstance, and unanimity (Amended Petition, ¶¶ C7(1), (4), C8) were unconstitutional.

---

18. These would include the statements made by the Petitioner while under hypnosis. Dr. Sadoff admitted that there is no way to determine whether the statements made by the Petitioner while under hypnosis are objective fact. (Transcript, at 504–505, 507, 508, 572, 575). The Court notes that Petitioner did not testify at the hearing to memories purportedly recalled during hypnosis.

During the hearing, the Court held that the hypnosis tape offered by the Petitioner was ad-

missible for the limited purpose of establishing what Dr. Sadoff relied upon in forming his opinion. (Transcript, at 505–516). The Court also determined that the hypnosis tape did not satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and declined to admit the statements made on the tape for the truth of the events leading up to and include the stabbings. (*Id.*).

(Docket Nos. 123, 124). For the reasons stated in that opinion, those claims are without merit, and are dismissed.

### VI. *Brady Violations*

As noted above, two of Petitioner's *Brady*[19] claims have been exhausted and are properly before this Court. Petitioner claims that the prosecution should have provided trial counsel with the transcript of his trial in 1972 for murder because, he contends, it would have supported an insanity or mental illness defense. (Amended Petition, ¶¶ D1(1)). Petitioner also claims that the prosecution should have provided the crime lab analysis indicating that no blood was found on the clothes seized from Petitioner's apartment. (Amended Petition, ¶¶ D1(7)).

In a series of cases beginning with *Brady v. Maryland*, 83 S.Ct. at 1196–97, the Supreme Court has held that the prosecution must disclose exculpatory evidence to the defense, with or without request. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Suppression of this evidence violates due process if the evidence is material either to guilt or to punishment, regardless of the good faith of the prosecutor. *Id.*

Withheld evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 105 S.Ct. at 3383. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. 105 S.Ct. at 3384. A showing of materiality does not require the defendant to show that the suppressed evidence would have resulted in the defendant's acquittal. 105 S.Ct. at 3383–84. Materiality is concerned with whether suppression of the evidence undermines confidence in the outcome of the trial. 105 S.Ct. at 3381.

The Supreme Court recently reaffirmed this standard for determining materiality in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 1567–68, 131 L.Ed.2d 490 (1995). The Court pointed out that "materiality" is not a sufficiency of the evidence test, which would require a defendant to show insufficient evidence to convict after discounting the inculpatory evidence in light of the undisclosed evidence. 115 S.Ct. at 1566. Rather, the defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (footnote omitted).

The Court explained that in considering materiality, a reviewing court is to assess the collective effect of the suppressed evidence in light of the evidence presented at trial. 115 S.Ct. at 1567. Finally, the Court pointed out that, once constitutional error is found under this standard, there is no need for further harmless-error review because the error cannot be found harmless. 115 S.Ct. at 1566–67.

On appeal of the denial of Petitioner's state post-conviction petition, the Tennessee Court of Criminal Appeals considered this issue as follows:

> Appellant next contends that his conviction and sentence were the result of prosecutorial misconduct because the state failed to provide him with exculpatory material as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In order to establish a violation of Brady, appellant must prove (1) the prosecutor suppressed evidence, (2) that the suppressed evidence would have been favorable to the defendant and (3) the materiality of the suppressed evidence.
>
> The evidence claimed to have been suppressed consisted of the transcript of the defendant's 1972 federal murder trial, lab reports on clothing seized from appellant's apartment, a police report about appellant's violent behavior at the time of his arrest, statements by his accomplice, Harold Devalle Miller, a police report suggesting that property belonged to one victim rather than the other, and information relative to the appellant's bank account. None of the above evidence was favorable to the defense. We find no merit to the appellant's claim of prosecutorial misconduct.

*Jones v. State*, 1995 WL 75427, at \*3 (Tenn. Crim.App. Feb.23, 1995).

---

**19.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Whether a *Brady* due process rights violation has occurred presents a mixed question of law and fact which is reviewed de novo. *Brown v. Cain,* 104 F.3d 744, 750 (5th Cir. 1997); *Reese v. Delo,* 94 F.3d 1177, 1183 (8th Cir.1996); *Hays v. Alabama,* 85 F.3d 1492, 1498 (11th Cir.1996).

In 1972, Petitioner was tried in a Virginia federal court for the murder of a fellow prisoner, Michael Stein. (Petitioner's Exhibit 131). He was convicted of second degree murder. (Exhibit 105). At that trial, a psychiatrist, Dr. Asot M. Masri, opined that Petitioner had been in a "homosexual panic" when he stabbed Stein.[20] (Petitioner's Exhibit 131, at 48). He testified that the Petitioner had a Borderline Personality Disorder and Schizoid Personality. (Petitioner's Exhibit 131, at 53). The Government called another psychiatrist, Dr. Robert Eardley, who opined that Petitioner was not suffering from a mental disease when he stabbed Stein. (Petitioner's Exhibit 131, at 57–58, 59, 66).

Petitioner argues that this evidence was exculpatory because the State argued at trial that Petitioner did not suffer from any emotional disturbance.

There is no dispute that the prosecutor had this transcript in his possession at some point before trial began. There is also no dispute that he did not provide the transcript to the defense.[21] Respondent contends that the state court was correct in concluding that the transcript was not favorable to the defense because neither psychiatrist opined that the Petitioner was insane.

▌ The Court believes this information was favorable to the Petitioner because the Petitioner had stated his intention to rely on

a mental illness defense at trial and sentencing (Transcript, at 959–60, 963), and Dr. Masri's testimony supported that defense. The Court is not persuaded, however, that the prosecution's failure to provide the transcript to defense counsel rises to the level of a due process violation because Dr. Masri's testimony was not "material."

In a later section of this Memorandum, the Court concludes that Petitioner received ineffective assistance of counsel because his trial counsel failed to investigate his mental health history, background and other areas of mitigation. The Court is not persuaded, however, that "the proceeding would have been different" if the prosecution had disclosed Dr. Masri's testimony to Petitioner's trial counsel. Petitioner's trial counsel already had various clues that should have led them to investigate Petitioner's mental health history, such as the records of Petitioner's evaluation at MTMHI before trial, and conversations with Petitioner's wife. There is no reason that Dr. Masri's testimony should have been the key element prompting Petitioner's counsel to take action.

Similarly, admission of this testimony as an item of evidence during the guilt phase of the trial would not have affected the result. Had Petitioner's defense counsel hired an expert to opine that Petitioner was insane at the time of the stabbings in 1986, Dr. Masri's testimony about an incident in 1972 could have supported that opinion, but it certainly would not have been vital. Absent an insanity defense, there would be no reason to admit this evidence relating to a prior crime during the guilt phase of the trial.

As for the sentencing phase, Dr. Masri's testimony would have served as an item of

---

**20.** Dr. Masri characterized homosexuality as a mental disease. (Petitioner's Exhibit 131, at 51).

**21.** During the hearing, the prosecutor explained his reasoning:

Based on all the testimony, I concluded for two reasons, one the lapse of time or I guess you might say the distance in time between the two events and what I call very weak testimony from the defense psychiatrist at the trial, that it was not exculpatory, would have no bearing on explaining whether at the time of this crime he had a mental illness or suffered from any kind of emotional snapping, because the situation in the federal prison was one where even taken in

light most favorable to the defendant was triggered as a result of a sexual assault on him.

That wasn't the case here where the defendant sought out the victim and went to the victim and pursued the victim.

(Transcript, at 1015–16).

As for mitigation, the prosecutor testified that his interpretation of the psychological testimony was that during the previous killing, the Petitioner "got angry and snapped." (Transcript, at 10 16). There was no evidence, according to the prosecutor, that there were any external circumstances operating on the Petitioner during the 1986 crime. (*Id.*)

mitigation relating both to the prior murder conviction, and to his mental history. But that testimony is only one item of evidence that, as .the Court explains below, should have been introduced by trial counsel during the sentencing hearing as mitigation evidence. Standing alone, the Court is not persuaded that the absence of Dr. Masri's testimony undermines confidence in the outcome of the sentencing hearing.

As for the lab reports finding that no blood was found on clothing seized from Petitioner's apartment, there has been no evidence that the prosecutor kept this evidence from the defense. The prosecutor testified that he provided the lab reports to Petitioner's first trial counsel, Neal McAlpin, and Mr. McAlpin testified that he received them. (Transcript, at 223–25, 227, 925). Furthermore, the prosecutor testified that he filed the reports with the trial court as part of his response to the Petitioner's discovery request. (Transcript, at 911, 926; Supplemental Response Number Two To Defendant's Request For Discovery, Exhibit 19). Under these circumstances, the Court concludes Petitioner's *Brady* claim regarding these lab reports is without merit.

Accordingly, the Court concludes that Petitioner's *Brady* claims are without merit, and are dismissed.

### VII. *Trial Counsel's Conflict of Interest*

■ Petitioner claims that one of his trial attorneys, Lionel Barrett, had an irreconcilable conflict of interest in representing Petitioner because he was paid a $5,000 retainer by Southeastern Gospel Ministry ("SEGM") member Alan Boyd to represent the Petitioner, and was promised an additional $ 10,000 that was never paid (Amended Petition, at ¶ E1).[22] Sometime after his arrival in Nashville, Petitioner joined SEGM, a nascent religious group that had as its goal "cleaning up" the African–American community by eliminating illegal activities, primarily drug dealing. (Addendum 11, at 15–16). Petitioner's boss, Alan Boyd, co-defendant Miller, and William Beard were also members of the group. (*Id.*). Petitioner and co-defendant

Miller both worked for Mr. Boyd at National Baptist Publishing.

Petitioner contends that Mr. Boyd had interests adverse to the Petitioner because Mr. Boyd and SEGM allegedly knew about and took part in the plan to visit the apartment of Patrick Daniels before the stabbings, and met with the Petitioner and co-defendant Miller after the stabbings. According to the Petitioner, Mr. Boyd retained Mr. Barrett and refused to pay him the full retainer with the effect of preventing Mr. Barrett from investigating the role of SEGM and Mr. Boyd in the crime.

In order to establish a Sixth Amendment violation, the Petitioner must show that an actual conflict of interest affected his lawyer's performance. *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987); *United States v. Mays,* 77 F.3d 906, 908 (6th Cir.1996).[23] Whether facts give rise to a conflict of interest is a mixed question of fact and law, which is to be reviewed de novo. *Mays,* 77 F.3d at 908.

In reviewing the denial of Petitioner's post-conviction petition, the Tennessee Court of Criminal Appeals found that Mr. Barrett did not know the funds he received came from SEGM member Alan Boyd. *Jones v. State,* 1995 WL 75427, at * 3 (Tenn.Crim. App. Feb.23, 1995). Petitioner argues that this finding is not fairly supported by the record because Gail Hughes Mann, who delivered the money to Mr. Barrett, testified at the post-conviction hearing that she told Mr. Barrett that the money came from Mr. Boyd. (Addendum 11, at 13).

Both Mr. Barrett and Ms. Mann testified in a hearing before this Court. Mr. Barrett was quite certain he was not aware the funds came from Mr. Boyd. (Transcript, at 294, 410). Ms. Mann, on the other hand, was more tentative:

Q. Did you tell him where the money came from?

---

22. $5,000 was inadequate to investigate and prepare this complex case for trial.

23. To the extent Petitioner argues that he is not required to show that the conflict "affected his lawyer's performance," this argument has been

soundly rejected. *See, e.g., Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984); *Wilson v. Rogers,* 125 F.3d 856 (Table), 1997 WL 615767 (6th Cir. Oct.3, 1997).

A. I don't remember that. I don't know if I told him or not. I probably did. I don't know.

Q. In the post-conviction proceeding you testified you did tell Mr. Barrett?

A. Probably so.

Q. Can you testify to that today?

A. That I told him?

Q. Yes.

A. I don't remember. I don't know. I might have told him. If I say I told him back then, I did then tell him.

(Transcript, at 1281). In her subsequent testimony, Ms. Mann was a bit more definite that she had told Mr. Barrett the source of her funds, Mr. Boyd, would not be providing any more funds. (Transcript, at 1288).

Based on the testimony of Mr. Barrett and Ms. Mann, the Court concludes that Mr. Barrett was not aware that Mr. Boyd was the source of the fee, even if Ms. Mann happened to mention it in a conversation with him. Even if Mr. Barrett was aware of the source of the fee, the Court is not persuaded that it affected his representation.

Petitioner argues that the conflict of interest led Mr. Barrett to fail to request attorneys' fees and funds for expert support services. Petitioner also argues this conflict led Mr. Barrett to delay representation and to refuse to ask for a continuance.

In order to accept Petitioner's argument, the Court must find that the source of Mr. Barrett's fees had interests contrary to Petitioner's interest. But, as noted above, the Petitioner himself testified at sentencing that SEGM did not order him to commit the crimes for which he was convicted.

Moreover, even if Mr. Boyd's interests were adverse to Petitioner, Mr. Barrett certainly did not protect the interests of SEGM or Mr. Boyd during the trial and sentencing. Mr. Barrett elicited testimony about another SEGM member, William Beard, during cross-examination of Mr. Miller at the trial. (Addendum 1, at 1527, 1567). He also elicit-ed testimony about SEGM from the Petitioner at the sentencing hearing, including testimony that Mr. Boyd supplied him with a shotgun, and William Beard supplied Mr. Miller with a pistol. (Addendum 1, at 1837–1848, 1855–1856).[24] Mr. Barrett also mentioned the Petitioner's connection with the group during his argument. (Addendum 1, at 1960). In addition, Mr. Barrett issued subpoenas for Mr. Boyd and Mr. Beard to appear at the trial. (Transcript, at 358).

During the evidentiary hearing in this Court, in response to a question by the Court, Mr. Barrett stated:

> Your Honor, I am as certain as a person can be from something that happened 10 years ago that I absolutely had no knowledge that these funds came from Mr. Boyd.
>
> For the sake of argument only—even if I had been told these funds came from Allen Boyd, I would have had absolutely no hesitancy in going after him in any way I could and would think he had wasted his money if that is what he was attempting to do.
>
> I am absolutely certain that there was no decision, no single issue of strategy, not one question that Mr. Camp or I asked or did not ask had anything to do with the source of the funds that came from Ms. Hughes or from Allen Boyd.

(Transcript, at 410).

The Court is not persuaded that any alleged conflict of interest affected the performance of Mr. Barrett at trial or sentencing. Accordingly, Petitioner's conflict of interest claim is without merit, and is dismissed.

### VIII. *Ineffective Assistance of Counsel*

#### A. *Generally*

Petitioner contends that trial counsel was ineffective during the guilt phase and during the sentencing phase of his trial (Amended Petition, at ¶ E2). In order to prevail on an

---

24. According to co-defendant Devalle Miller's testimony at the postconviction proceeding, Alan Boyd met with Petitioner and Miller right after the murder of Patrick Daniels, and William Beard helped Miller leave town shortly thereafter. (Addendum 11 at 26–30). Mr. Boyd purchased the shotgun carried by Petitioner during the murder from a gun dealer in 1983, according to a firearms trace report. (Docket No. 200).

Alan Boyd and William Beard both asserted their Fifth Amendment privilege against self-incrimination at depositions taken in this case. Boyd and Beard effectively refused to answer any questions. (Petitioner's Exhibits 148, 149).

ineffective assistance of counsel claim, the burden is on the Petitioner to show: (1) trial counsel's performance was deficient; and (2) actual prejudice resulted from the deficient performance. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064–68, 80 L.Ed.2d 674 (1984); *O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir.1994).

In order to demonstrate that trial counsel's performance was deficient, a petitioner must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 104 S.Ct. at 2064. The petitioner must show that trial counsel's performance, fell below an objective standard of reasonableness, measured by "prevailing professional norms." *Id.*

In analyzing trial counsel's performance, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 104 S.Ct. at 2065. The petitioner must overcome the presumption that the challenged action by counsel was sound trial strategy. *Id.*

One of the duties of counsel is the duty to investigate his client's case. 104 S.Ct. at 2066. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*

In order to show actual prejudice, a petitioner must show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 104 S.Ct. at 2068. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*

Thus, when a petitioner challenges his conviction on ineffective assistance of counsel grounds, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt about guilt. 104 S.Ct. at 2068–69. When the petitioner challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that "the balance of aggravating and mitigating circumstances did not warrant death." 104 S.Ct. at 2069. In assessing prejudice,

the court is to assume that "the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." 104 S.Ct. at 2068.

The ultimate question of whether Petitioner received effective assistance of counsel is a mixed question of law and fact, which is reviewed de novo. 104 S.Ct. at 2070; *McQueen v. Scroggy,* 99 F.3d 1302, 1311 (6th Cir.1996).

Petitioner's contention that his trial counsel, Lionel Barrett and Sumter Camp, were ineffective was first raised on direct appeal by Petitioner's substitute counsel, Richard Dinkins. Petitioner argued that trial counsel should have presented evidence of Petitioner's mental incapacity at sentencing. (Addendum 2, at 57–59). In addressing this claim, the Tennessee Supreme Court stated: "There is no evidence in this record or any other part of [the Petitioner's] extensive criminal record to indicate he was either incompetent to stand trial or at the time this offense was committed. There is nothing in this record to indicate a remand for a determination of defendant's mental status would be appropriate." *State v. Jones,* 789 S.W.2d at 552.

Petitioner raised this issue again in his post-conviction petition. Petitioner based his contention that counsel was ineffective on over twenty separate grounds. (First Amended Petition For Post Conviction Relief, Addendum 11). At the post-conviction hearing, Petitioner's counsel called Petitioner's initial attorney, Neal McAlpin; trial counsel, Lionel Barrett and Sumter Camp; and appellate counsel, Richard Dinkins. (Addendum 11). Petitioner also called Gail Hughes Mann; Petitioner's co-defendant, Harold Devalle Miller; Petitioner's wife, Susi Bynum Jones; and a psychiatrist, Dr. Barry Nurcombe. (*Id.*)

The post-conviction trial court found that Petitioner's trial counsel had failed to adequately investigate Petitioner's background and mental health history. (Memorandum and Order entered August 26, 1993, Addendum 11). Specifically, the post-conviction court found that trial counsel failed to investigate as follows:

1. Testimony and files of trial counsel showed that few witnesses were investigated or interviewed regarding petitioner's background and mental health history.

2. Testimony and files of trial counsel showed that they failed to investigate and obtain available information concerning petitioner's prior psychological consultation at ages 12 to 14 while at Ft. Shafter, Hawaii.

3. Testimony and files of trial counsel showed that they failed to investigate and obtain readily available information concerning petitioner's psychological assessment at age 14 by the school psychologist at Dupont Jr. High School at Ft. Lewis, Washington.

4. Testimony and files of trial counsel showed that they failed to investigate and obtain available information concerning petitioner's juvenile incarceration for being a psychopathic delinquent at Western State Hospital in Tacoma, Washington.

5. Testimony and files of trial counsel showed that they failed to investigate and obtain available information concerning the petitioner's school records in Philadelphia, where on May 24, 1965 there was a request for psychological service by Sayre High School.

6. Testimony and files of trial counsel showed that they failed to investigate and obtain available information concerning petitioner's school records in Philadelphia, where on June 17 he was referred for Special Education.

7. Testimony and files of trial counsel showed that they failed to investigate and obtain available information concerning petitioner's incarceration at the Annadale Institute for Boys, New Jersey, when he was 15, his being placed on psychiatric watch in January of 1967 and his referral to and psychological examination at the New Jersey State [Psychiatric] hospital at Trenton in February of 1967.

8. Testimony and files of trial counsel showed that they failed to investigate and obtain available information concerning petitioner's Army records at ages 17 and 18 with notations regarding his "questionable mental status," bizarre behavior, and psychiatric reports leading ultimately to discharge.

9. Testimony and files of trial counsel showed that they failed to investigate and obtain available information concerning petitioner's psychiatric examination at St. Elizabeth's Hospital, Washington, D.C., following his incarceration for assault on or about the day of his discharge from the Army, despite the fact that part of this information was sent to MTMHI per their request.

10. Testimony and files of trial counsel showed that they failed to investigate and obtain available information concerning petitioner's institutional records while in the federal prison system.

11. Testimony and files of trial counsel showed that they failed to investigate and obtain available information concerning petitioner's psychiatric examination following petitioner's 1972 killing of a fellow prisoner while incarcerated for the assault referenced in paragraph 9 above.

12. Trial counsel has little knowledge of the facts related to the petitioner's 1972 murder conviction.

13. They failed to interview the psychiatrist and psychologist who conducted the MTMHI evaluation until *after* the trial began.

(Memorandum and Order entered August 26, 1993, at 5–6, Addendum 11) (footnote omitted) (emphasis in original).

The court concluded, however, that the failure to investigate did not prejudice the Petitioner because his background also contained harmful information. (*Id.*)

The Tennessee Court of Criminal Appeals agreed with the trial court's decision:

If the trial attorneys had investigated further, they would have found that the appellant had a long history of violent behavior and anti-social personality disorders. We agree with the trial judge's finding that trial counsel were ineffective in failing to further investigate the background of the accused under the circumstances, but we also agree with Mr. Barrett's testimony and the trial judge's conclusion that it probably would not have been the most prudent trial strategy to use proof of appellant's history of violent behavior and anti-social personali-

ty disorders at either the guilt or innocence phase or at the sentencing phase of the trial.

*Jones v. State,* 1995 WL 75427, at *2.

During the evidentiary hearing in this Court, Petitioner called all the witnesses who testified at the post-conviction proceeding except Dr. Nurcombe and Mr. Miller. In addition, Petitioner presented, for the first time, the live testimony of Petitioner's half-sister, Nancy Lancaster; Petitioner's former fiancé, Sarah Roberts Walton; co-defendant Miller's former attorney, Ross Alderman; mental health experts, Dr. Sadoff, and Dr. Nancy McCoy; Dr. Ray Winbush; and legal expert Brian Stephenson. Petitioner also presented, for the first time, the testimony of Detective Mark Garafola, Elmer H. Bishop, William Delagrange, and Richard Bretzlauf by deposition. (Petitioner's Exhibits 110, 135, 136, 152).

During their testimony before this Court, Mr. Barrett and Mr. Camp admitted most of the deficiencies alleged by the Petitioner. Mr. Barrett was first requested to represent the Petitioner in October, 1996. (Transcript, at 326). During the next month, Petitioner's initial counsel, Neal McAlpin, began to withdraw from representation. (Transcript, at 233–234). Mr. Barrett did not begin actually working on the case, however, until March, 1987. (Transcript, at 336–337). On April 20, 1987, Mr. Barrett first requested the help of Mr. Camp, who was an associate with Mr. Barrett's firm at that time. (Transcript, at 271–272, 342, 691). Mr. Camp first began work on the file sometime after May 11, 1987. (Transcript, at 691–692). Mr. Barrett took the lead in the case, and Mr. Camp's role was to assist him. (Transcript, at 695, 723). Trial was set for July 6, 1987. (Transcript, at 338).

Trial counsel had three to four months to prepare for trial. The investigation they conducted during this time was wholly inadequate. Mr. Barrett admits that he did not obtain Mr. McAlpin's file in the case, or discuss the case in any kind of depth with Mr. McAlpin, even though Mr. McAlpin sug-

gested that he do so. (Transcript, at 240–242, 277, 279, 722). Because of that failure, and the subsequent failure to inspect the court file, Petitioner's trial counsel were not aware of the lab reports indicating that no blood was found on clothes seized from Petitioner's apartment. (Transcript, at 277, 292, 322, 341, 331–333). Counsel also failed to respond to a request, sent to Mr. McAlpin, from MTMHI staff for background information to be used in their psychiatric evaluation of the Petitioner. (Transcript, at 242–243, 331–333).

Mr. Barrett failed to request Petitioner's extensive mental health records, or his educational, prison, or military records. (Transcript, at 280–281). This was a serious failure.

Although Mr. Barrett prepared a motion requesting that the trial court declare his client indigent, and approve funds for investigative and expert services, he did not file the motion. This was a significant error. (Transcript, at 278, 363–367, 701).[25] Mr. Barrett did not consult or hire a mental health expert to perform an independent mental evaluation of his client. (Transcript, at 278, 718–719). This was a grave omission.

Mr. Barrett did not introduce any information from the MTMHI records relating to Petitioner's background or mental history at the trial or at sentencing. (Transcript, 725). Trial counsel received the MTMHI records only a couple of weeks prior to the trial, and neither recall speaking with any of the MTMHI staff about their report. (Transcript, at 280, 282, 352, 716–717). These were substantial errors.

Petitioner's attorneys did not call anyone in Petitioner's family to testify during the sentencing hearing. Mr. Barrett testified that someone in his office contacted Petitioner's brother, Mark Jones, before trial, but he refused to assist in Petitioner's defense. (Transcript, at 286–289). Mr. Camp testified that he did not contact the Petitioner's brother. (Transcript, at 710). At the post-conviction hearing, Petitioner introduced an affidavit from Mark Jones[26] indicating that he had

---

25. The Motion was prepared three days after jury selection began. (Transcript, at 727). A post-trial motion for indigent status was approved. (Transcript, at 376; Petitioner's Exhibit 88).

26. Mark Jones committed suicide on July 13, 1996. (Transcript, at 793).

not been contacted by Mr. Barrett's office. (Petitioner's Exhibit 74; PC Exhibit 67). It is undisputed that Petitioner's attorneys did not contact Petitioner's half-sister, Nancy Lancaster, even though she would have been available and willing to testify at the time of trial. (Transcript, at 832). Mr. Barrett did not contact Petitioner's former fiancé, Sarah Roberts Walton, even though the Petitioner told Mr. Barrett about her. (Transcript, at 356). These were significant mistakes.

Finally, Mr. Barrett failed to investigate the nature of Petitioner's prior convictions.[27] (Transcript, at 281, 708–709, 714–715). This was a substantial error.

As the trial date approached, Mr. Camp suggested that they request a continuance to conduct further investigation, but Mr. Barrett did not act on that suggestion. (Transcript, at 279, 705). This was a serious deficiency.

Although both these attorneys have good reputations in the bar, their performance in this case was clearly inadequate. Mr. Barrett critiqued his own performance as follows:

I think as the trial progressed and on looking back on it now, I think that I should have sought out further psychiatric evaluation. I think it became evident during the course of the trial that Mr. Jones— and in Mr. Camp's opinion and my opinion had some psychiatric or psychological issues we may not have fully realized early on in the case ... Based upon the documents that I have now seen subsequent to the trial, I feel that my performance certainly did not satisfy the standards that I

adhere to myself as far as pursuing the psychiatric aspect, particularly at the sentencing hearing.

(Transcript, at 394–395).[28]

Mr. Camp's assessment was even more negative. He testified that he agreed with the state courts that his representation was deficient:

We did not present the information to this jury so that they would know James Jones, so that in deciding whether he was to live or die they would know this man, they would know this human being. That was our failure.

\* \* \* \* \* \*

... [W]e didn't give the jury any reason to oppose death on James Jones. We didn't explain to them how James Jones came to be in that courtroom facing them.

(Transcript, at 734, 741, 766).

▪▪▪ Thus, this Court, like the state post-conviction trial court and appeals court, finds that trial counsel's performance during the guilt phase and during sentencing was deficient. Unlike those courts, however, this Court concludes that Petitioner suffered prejudice as a result of that deficiency during the sentencing phase of this trial.

▪▪▪ Before addressing prejudice at sentencing, the Court will consider whether trial counsel's deficiencies prejudiced Petitioner as to the guilt phase of the trial. Petitioner argues he was prejudiced because trial counsel did not introduce the lab report indicating that no blood was found on clothes seized

---

**27.** Mr. Barrett testified that the prosecutor introduced him to FBI Agent William Delagrange at trial, and that the agent said he would testify that Petitioner's 1972 conviction was the result of a "drug turf war," and not a homosexually-related killing, as Petitioner contended. (Transcript, at 294–299). Given his failure to investigate Petitioner's prior convictions, Mr. Barrett did not have any independent information about the conviction, and therefore, did not introduce mitigating evidence about this conviction at the sentencing hearing. (Transcript, at 299). As discussed herein, the 1972 conviction was not over drugs and gangs as represented by the prosecution to defense counsel. The murder concerned homosexual conduct that the jury could have found more mitigating.

**28.** Shortly after the trial, defense counsel realized the need to fully consider Petitioner's mental state. Mr. Barrett wrote Mr. Camp the following memorandum on August 26, 1987:

You will get a copy of communication from James Lee Jones saying that he thinks he is going to get the Nobel Peace Prize. I think he is probably crazy. I think that we should move to have him psychiatrically evaluated prior to the sentencing hearing in view of the United States Supreme Court decision that you cannot execute a person that is crazy. I also think that in the sentencing provision in the code there is some indication that a person can be psychatrically [sic] evaluated. We need to get this done as soon as possible and I would appreciate it if you could prepare the paperwork.
(Petitioner's Exhibit 85).

from Petitioner's apartment, and because trial counsel failed to obtain an expert to support an insanity defense.

The Court is not persuaded that if trial counsel had presented the lab report to the jury, they would have had a reasonable doubt about guilt. As discussed above, there is no evidence that Petitioner was wearing the clothes seized from his apartment during the stabbings.[29]

■■■ Similarly, the Court is not persuaded that trial counsel's presentation of a mental health expert to testify on behalf of the Petitioner would have left the jury with a reasonable doubt about Petitioner's guilt. It is not clear that trial counsel would have found an expert to testify that Petitioner was insane at the time of the stabbings. As noted above, Dr. Sadoff's opinion that Petitioner was insane at the time of the offense comes some twelve years after the crime. Furthermore, any testimony to this effect would have been countered by the prosecution with MTMHI's opinion that there was no basis for Petitioner to invoke an insanity defense. Thus, the Court concludes that Petitioner suffered no prejudice at the guilt stage as a result of trial counsels' deficiencies.

As for sentencing, however, the Court concludes that there is more than a reasonable probability that, had trial counsel introduced the mitigation evidence they would have had available after a reasonable investigation, the result of the sentencing would have been different. The Court is of the opinion that the complete lack of mitigation evidence at sentencing undermines confidence in the outcome of the sentencing.

In evaluating the prejudice at sentencing, it is important to keep in mind the nature of mitigation evidence during the sentencing proceeding. In the "eligibility" phase of the sentencing proceeding, the jury narrows the class of defendants "eligible" for the death penalty, generally by determining whether certain well-defined aggravating circumstances are applicable to the case. *Buchanan v. Angelone,* —— U.S. ——, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998); *Godfrey v.*

*Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980). During the "selection" phase, the jury determines whether to impose the death penalty on a particular defendant. *Buchanan,* —— U.S. at ——, 118 S.Ct. at 761. In regard to making this "selection" decision, the Supreme Court has "emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination." *Id.* Indeed, the Court has consistently held that "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Id.*

Mitigating evidence relevant to the selection decision includes " 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 2946, 106 L.Ed.2d 256 (1989). As the Supreme Court has explained: "If a sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' " 109 S.Ct. at 2947 (quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987)). The sentencing decision should reflect "a reasoned moral response to the defendant's background, character, and crime." *Id.*

Thus, there is a broad array of evidence that is considered to be relevant to mitigation. In addition, the rules of evidence do not apply to the presentation of that evidence. During the relevant time period, Tennessee Code Annotated Section 39–2–203(c) provided:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punish-

---

**29.** Petitioner also ignores the fact that he admitted his guilt at sentencing. (Addendum I, at 1865, lines 5–12; 1866, line 25 through 1867, line 6; 1893, lines 4–8; 1894, lines 7–10; 1957, lines 18–19; 1961, lines 22–25; 1968, lines 19–23).

ment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of evidence secured in violation of the Constitution of the United States or of the state of Tennessee.

(Exhibit 155).[30] Consequently, Petitioner's counsel were not constrained by evidentiary restrictions in introducing mitigation evidence at sentencing.

In this case, there was an abundance of mitigation evidence available that was never used at trial. For example, trial counsels' reasonable investigation would have produced information about Petitioner's childhood abuse by his father, a military policeman. Trial counsel could have introduced evidence about this abuse through descriptions contained in some of Petitioner's mental health records, through the testimony of Petitioner's step-sister, Petitioner's wife, Peti-

tioner's now-deceased brother, and Petitioner's former fiancé.[31]

During the hearing in this Court, Nancy Lancaster, Petitioner's half-sister, testified about the abuse and difficulties Petitioner experienced during his childhood. (Transcript, at 786, 818, 822–823, 832, 838–839). Although some of the information Ms. Lancaster related was based on statements made by other family members, the Court was very impressed with Ms. Lancaster's credibility and demeanor.

Ms. Lancaster testified that she and the Petitioner share a common mother, who abandoned Ms. Lancaster and her two brothers when she was an infant. (Transcript, at 786–787). Petitioner's mother put her three children in a taxi, drove them to the woods, and left them. (Transcript at 787).[32] Petitioner's mother later married Petitioner's father, James Jones, Sr. (Transcript, at 793–794). Three more children were born of that marriage—James (Petitioner), Mark, and Sylvia.

Petitioner's statements to mental health providers provide a vivid description of the abuse Petitioner suffered at the hands of his father. Petitioner received regular beatings with a leather strap from his father. (Transcript, at 629–634; Petitioner's Collective Exhibit 150; February 9, 1967—New Jersey State Hospital, Respondent's Collective Exhibit 9). Petitioner's father made him take off his clothes, placed him hog-tied in a locked closet, and tethered him to a hook

30. Thus, this Court has used a similar standard in determining whether prejudice has been established in light of the evidence that could have been admitted at the sentencing hearing. In that regard, the Court notes that Rule 7 of the Rules Governing Section 2254 Cases provides that the habeas corpus record may be expanded "by the inclusion of additional materials relevant to the determination of the merits of the petition." Habeas Corpus Rule 7(a). The Rule indicates that copies of letters, documents, exhibits, and affidavits may be included in the expanded record. Habeas Corpus Rule 7(b). The court "may require" the authentication of material added to the record under the Rule. Habeas Corpus Rule 7(d). Thus, Rule 7 contemplates a relaxed application of the hearsay, best evidence, authentication, and other evidentiary rules under the Federal Rules of Evidence. Liebman, *Federal Habeas Corpus Practice and Procedure*, § 19.5, at 532 (2d ed.1994).

31. The affidavit of Mark Jones, Petitioner's deceased brother, which was introduced at the post-conviction hearing, confirms Petitioner's statements about the abuse and other difficulties he encountered during his childhood. (Mark Jones Affidavit, ¶ 5, Petitioner's Exhibit 74). Sarah Roberts Walton and Susi Bynum testified in this Court about Petitioner's previous statements to them that he had suffered abuse as a child. (Transcript, at 1191–1192; February 19, 1987—MTMHI Social History, Petitioner's Collective Exhibit 150).

32. As a result, Ms. Lancaster was unable to testify as to her age or birthday. (Transcript at 787). The taxi driver went back to the woods, retrieved the children, and turned them over to the state. *Id.*

with a piece of leather tied around the head of his penis. (Transcript, at 475, 631, 818; Petitioner's Collective Exhibit 150). Petitioner's father struck Petitioner's penis with a baseball bat. (Transcript, at 475, 632). To punish him for smoking, Petitioner's father required him to eat a pack of cigarettes, and when he vomited, was made to eat the vomit. (Transcript, at 634). None of this extraordinary abuse, which constitutes relevant mitigating evidence, was heard by the jury. This was a grave omission by defense counsel.

This, of course, is not to suggest that people who are abused as children should get away with murder. People with bad childhoods can be sentenced to death. But, the Constitution requires that these significant facts should have been presented to the jury at sentencing by counsel.

Petitioner's school and mental health records indicate that Petitioner's family lived in several different locations, and that Petitioner had undergone mental evaluations several times during his childhood. Petitioner ran away from home several times, and eventually, at 15, left home for good. (Mark Jones Affidavit at ¶ 4, Petitioner's Collective Exhibit 74; Transcript, at 630).

A reasonable investigation would have produced information about Petitioner's mental history. A review of the MTMHI records, which trial counsel had in their possession before trial, would have indicated that Petitioner had had prior mental evaluations, that he had served in the army, and had spent several years in prison. (Petitioner's Collective Exhibit 150). Petitioner's school, military and prison records reveal that Petitioner had been diagnosed in 1964 as having "paranoid personality" (December 11, 1964—Western State Hospital, Tacoma, Washington, Respondent's Collective Exhibit 8) and, in 1971, as having a "passive aggressive personality, aggressive type." (May 11, 1971—FR, Petersburg, Petitioner's Collective Exhibit 142). These records also describe the Petitioner as: "very sick" and in need of immediate commit-

ment (November 12, 1964—Richard Stiles of Dupont Junior High School, Respondent's Collective Exhibit 8), "in serious need of therapy" (May 24, 1965—Sayre Junior High School Staff, Respondent's Collective Exhibit 7); and "highly disturbed." (December 30, 1970—FR, Petersburg, Petitioner's Collective Exhibit 142; Respondent's Collective Exhibit 6, Tab 8). The records also reflect numerous suicide attempts (February 9, 1967—New Jersey State Hospital, Respondent's Collective Exhibit 9; April 15, 1969—Baltimore City Jail, Respondent's Collective Exhibit 6, Tab 2; March 19, 1971—FR, Petersburg, Petitioner's Collective Exhibit 142; June, 1972—FCI, Tallahassee, Addendum 11, PC Exhibit). None of this evidence was offered to the jury. This was significant error by counsel.

Petitioner also had a family history of serious mental conditions. Petitioner's sister, Sylvia, attempted suicide on multiple occasions and was institutionalized several times for mental health problems. (Transcript at 803, 815, 626). Petitioner's brother, Mark, committed suicide while this case was pending in this Court.[33] To call the Jones family dysfunctional would be an understatement. (Transcript at 626).

Had counsel conducted an in-depth interview before calling Susi Bynum to testify at sentencing, they would have gathered more evidence regarding Petitioner's mental health. They would have learned about Petitioner's belief that he and his wife would have the next Messiah; Petitioner's having carried on conversations with nonexistent people and animals; and his having banged his head against the wall on various occasions. (Transcript, at 1224, 1225, 1229, 1216).[34] Again, none of this evidence was made known to the jury. Ms. Bynum testified that she even told Mr. Barrett that he should have a psychiatrist examine the Petitioner before the trial. (Transcript, at 1250). These were serious deficiencies by defense counsel.

---

33. Sylvia Jones, as a teenager, had a child out of wedlock by her own father according to Ms. Lancaster's uncorroborated view of the family's history. (Transcript at 793–795). The whereabouts of Sylvia Jones is unknown. Mark Jones committed suicide on July 13, 1996. (Transcript at 793). The suicide was within days of his arrest for sexually and physically abusing his children. (Transcript at 627).

34. The Court notes that the MTMHI files also revealed much of this same information. (Petitioner's Collective Exhibit 150).

Had trial counsel heeded Ms. Bynum's suggestion and hired a mental health professional to evaluate the Petitioner, or had they interviewed MTMHI's Dr. Craddock, they could have presented evidence that Petitioner had, at the very least, exhibited symptoms of a Borderline Personality Disorder, including extreme emotional swings, identity disturbance, and self-mutilating behavior. (Transcript, at 129–132; 140). A mental health professional, like Dr. McCoy, could have offered testimony about Petitioner's background and mental history, and could have offered an explanation placing in context the negative aspects of Petitioner's past. (Transcript, at 613–663). By describing Petitioner's history of earnestly seeking a religious faith with which to align himself, Dr. McCoy's testimony would have supported the notion that Petitioner had been strongly influenced by the SEGM. None of this was put into evidence before the jury. The failure of counsel to do so was a serious error.

■ Trial counsel could have presented testimony showing that, despite his mental health problems, Petitioner had functioned as a productive member of society during the year before he came to Tennessee. If they had heeded Petitioner's suggestion that they talk with Sarah Roberts Walton, Petitioner's former fiancé, they could have learned that after Petitioner was released from prison in Chicago, in 1983, he was hard-working and giving. Ms. Walton, now an attorney for the State of Maine,[35] testified that when she knew the Petitioner in 1983, he held a steady job, attended college, and performed volunteer work with a Quaker youth group at Cabrini Green, a large, infamous public housing development in Chicago known for its poverty and violence. (Transcript, at 1181, 1195–1196, 1197, 1205; Bretzlauf deposition, at 14–15, 17).[36] Ms. Walton described the Petitioner as gentle, caring, and filled with dignity; a person with whom she shared a sincere Christian belief. (Transcript, at 1204–1205). The jury heard nothing of the sort from any witness. This was a very significant failure by defense counsel.

The Court finds the testimony of Ms. Walton to be extremely credible. The content of her testimony, as well as her demeanor, made her a compelling mitigation witness on behalf of Petitioner for purposes of sentencing. Ms. Walton's testimony, based on personal knowledge, added a humanizing dimension to the life history and character of the Petitioner, good and bad, that was absent from any prior proceeding in state court, and yet could have been presented to the jury, had trial counsel conducted a reasonable investigation.

■ Had defense counsel learned more about the 1972 murder conviction, they could have presented evidence to the jury that the killing occurred when Petitioner approached the victim, Michael Stein, in his cell to confront him about spreading rumors that Petitioner had engaged in homosexual conduct, and that Petitioner stabbed Stein during that confrontation. (Bishop Deposition, at 22–23, 24–25, 26, Petitioner's Exhibit 135; Delagrange Deposition, at 18–19, Petitioner's Exhibit 136; Petitioner's statement dated April 2, 1972, attached as Exhibit to Delagrange Deposition, Petitioner's Exhibit 136; Letter dated April 15, 1987 from David G. Lowe to John Zimmerman, attached as Exhibit to Delagrange Deposition, Petitioner's Exhibit 136; Memo dated April 7, 1972 from H.R. Hogan to Norman A. Carlson, attached as Exhibit to Delagrange Deposition, Petitioner's Exhibit 136).[37] The prison murder was

---

35. Ms. Walton has represented the State of Maine on two murder appeals. (Transcript at I 182).

36. Ms. Walton ultimately broke off the engagement because she was concerned that Petitioner had psychological problems. (Transcript, at 1189–1190). Petitioner subsequently moved to Tennessee the year before the stabbings to be close to his brother, Mark Jones, who was stationed at Fort Campbell. (Transcript, at 1195).

37. In response to a claim made by Mrs. Stein after her son's death, representatives of the federal institution where he had been incarcerated took the position that:

> Mr. Stein was a member of a group of inmates who were attempting to apply extortionate pressures on Jones to submit to Stein's demands for homosexual activities. The assault itself on April 1 arose out of an attempted assault on Jones approximately two weeks earlier by members of this group.

(Petitioner's Collective Exhibit 142; Bishop Deposition, at 25, Exhibit 135).

not about drugs and gangs as represented by the prosecution to defense counsel.

More importantly, Dr. Masri testified at the 1972 murder trial that Petitioner had a "homosexual panic" and lost control when he killed Stein. (Petitioner's Exhibit 13 1, at 48). As noted above, Dr. Masri also diagnosed the Petitioner as having a Borderline Personality Disorder and Schizoid Personality. (Petitioner's Exhibit 131, at 53). Although this information does not provide a justification for the murder, it does provide the jury with some information upon which to evaluate it. Without some information tending to mitigate this prior murder, there was nothing to alter the likely mindset of the jury that because Petitioner had killed someone before, he was not deserving of any leniency. The jury heard none of this evidence. Again, defense counsel made a substantial mistake.

Instead, at the sentencing hearing, the jury heard only two witnesses for the defense, the Petitioner and his wife. The defense was breathtakingly brief in content, and lacking in quality, and quantity. (Addendum 1, at 1836–1930). Petitioner's testimony on direct was essentially limited to his relationship with SEGM, his account of the events surrounding the stabbings, and a plea for his life. (Addendum 1, at 1836–1870). During crossexamination, the Petitioner initially lost his composure, and was not particularly articulate in answering the prosecutor's questions. (Addendum 1, at 1870–1905). Mr. Camp described the Petitioner's performance as "one of the saddest things I have seen in my legal career." (Transcript, at 731).[38]

The only line of questioning put to Petitioner's wife, Susi Bynum Jones, related to whether she had written some bad checks before Petitioner was incarcerated. (Addendum 1, at 1919–1929).[39] Counsel did not even attempt to elicit testimony from Mrs. Jones that she loved her husband, found good in him, or hoped he would not be executed.[40]

The jury in this case heard no witnesses who expressed a concern whether Petitioner lived or died, even though such witnesses were available and known to defense counsel. This was a grievous flaw.

As Respondent argues, and the state courts found, there was also a considerable amount of negative evidence that the prosecution could have introduced during the sentencing hearing. That evidence includes a criminal record which indicates that Petitioner was convicted of assault at the age of 15, and two more assaults at the age of 19. (Petitioner's Exhibit 105; Petitioner's Exhibit 146; Respondent's Collective Exhibit 9; Respondent's Collective Exhibit 10). As noted above, Petitioner was convicted of the second degree murder of Michael Stein at the age of 21. (Petitioner's Exhibit 105).

Petitioner has been diagnosed as having a sociopathic personality disturbance with antisocial reaction and mild depression, (March 10, 1967—New Jersey State Hospital, Respondent's Collective Exhibit 9), as having an anti-social personality (November 7, 1968—Fort Meade, Maryland, Respondent's Collective Exhibit 10; June, 1977—USP Leavenworth, Kansas, Respondent's Collective Exhibit 6, Tab 59), and as having a psychopathic personality. (January 13, 1978—USP Leavenworth, Kansas, Respondent's Collective Exhibit 6, Tab 67).

Petitioner has also been diagnosed as having no mental illness. (April 15, 1969—Balti-

---

**38.** Mr. Camp described trial counsels' deficiencies regarding Petitioner's testimony:

> It is my opinion that Mr. Jones was not prepared to go on the stand, that because of what I perceived to be his mental health problems that it would be hard for him to have been successful on the stand because we had not provided the factual foundation that the jury needed to be able to hear this man in context, that all they got was literally this man begging for his life.
>
> And it was more than he could handle and that he just broke down.
>
> (Transcript, at 731).

**39.** Even though he conducted the direct examination of the Petitioner's wife, the only mitigation witness offered besides the Petitioner, Mr. Camp did not conduct an interview with her prior to trial. (Transcript, at 724; 1248, 1250).

**40** Ms. Jones spoke effervescently about her husband at the hearing in this case. "Well, when I first met James, he opened up his mouth, it was like thunder from heaven ... I was fascinated with James ... he was different, just different from any man I had ever met ... he wanted to do something for the world. I was intrigued by that." (Transcript, at 1216).

more City Jail, Respondent's Collective Exhibit 6, Tab 2; December 3 1, 1969—St. Elizabeth's Hospital, Respondent's Collective Exhibit 11; April, 1970—Dr. Angus, Respondent's Collective Exhibit 6, Tab 101; Dr. Eardley testimony at Stein murder trial, Petitioner's Exhibit 131, at 57–58, 59, 66).

The prosecution could have introduced evidence that during his many years in prison, Petitioner was involved in numerous citations for misconduct, including possession of a knife. (Respondent's Collective Exhibit 6). Prison records would also show that Petitioner escaped shortly before his parole date in 1982, but was recaptured a few months later. (Respondent's Collective Exhibit 6, Tab 94). While on escape, Petitioner was a witness in a murder case.

Petitioner's army records indicate that during his service in the army, Petitioner was absent without leave on more than one occasion, and ultimately, was discharged under conditions other than honorable. (Respondent's Collective Exhibit 10).

Finally, Petitioner's school records indicate that he was suspended from school for threatening a teacher with a knife. (May 24, 1965—Sayre Junior High School, April 25, 1966—Shaw Junior High School, Respondent's Collective Exhibit 7; February 9, 1967—New Jersey State Hospital, Respondent's Collective Exhibit 9).

 Notwithstanding this negative evidence, however, the Court is persuaded that had counsel presented the other evidence of Petitioner's background and mental history, there is more than a reasonable probability that at least one juror would have voted for a life sentence rather than the death penalty. It only takes one juror to decide that the mitigation evidence presented by the Petitioner outweighs the aggravating circumstances established by the prosecution. (Tenn.Code Ann. § 39-2-203; Exhibit 155). No mitigation evidence was presented during Petitioner's sentencing, and therefore, it is not surprising that the jury struck the balance in favor of the death penalty.

This is not a case where counsel collected and put on the significant mitigating evidence and merely failed to get everything. This is a case of no mitigating evidence—none—being offered to the jury despite its availability and abundance. Defense counsel was substantially ineffective and Petitioner was thereby deprived of a constitutionally fair trial.

Petitioner stated it succinctly to the jury at sentencing:

> I don't know you. You don't know me. So, it ain't no feeling there what you should do to me.

(Addendum 1, at 1869, lines 15–16).

According to the prosecutor's assessment after trial, given the paucity of evidence that was presented by Petitioner's attorneys, the jury had little reason to hesitate in imposing the death penalty: "The jurors all expressed to us their satisfaction with their verdict and were quite surprised at their own ability to impose the death penalty on this particular man with no reluctance whatsoever." (Letter dated July 17, 1987 from John Zimmerman to David G. Lowe; Petitioner's Collective Exhibit 136).

The Court acknowledges that Lionel Barrett and Sumter Camp have good reputations in the Nashville bar for being fine criminal defense lawyers. This case illustrates that lawyers do not make cases based on their reputations. A lawyer must actually work on each case. Cases are made through factual investigation, research, writing, witness preparation, trial strategy, and a bit of good fortune. In this case, the hard work required was simply not done. This Court agrees with the state post-conviction trial and appellate courts that Mr. Barrett and Mr. Camp provided inadequate representation. Good lawyers can and do fail. Here, Mr. Barrett and Mr. Camp utterly failed in their duty to adequately represent their client, who, as a result of this miscarriage of justice, was unconstitutionally sentenced to death.[41] This is not a case of harmless error.

This conclusion is not one the Court reaches casually. The Court is mindful of the importance of the sovereignty of the State of

---

**41.** Mr. Barrett as lead counsel, and Mr. Camp as assistant counsel, each had an independent duty to provide effective assistance of counsel.

**1102**

Tennessee and the need to respect the certainty and finality of court judgments. This Court has no interest in simply second-guessing the decisions of the state courts. But the overwhelming nature of the evidence presented to this Court, a significant portion of which was not presented to the jury or the state courts,[42] and the almost complete failure to present a defense at Petitioner's sentencing hearing, compels the Court's conclusion that Petitioner's death sentence cannot stand. The Constitution of the United States, and this Court's duty to uphold its principles, mandate the issuance of the writ of habeas corpus as to Petitioner's death sentence.

### IX. *Conclusion*

All Petitioner's claims are procedurally defaulted except Petitioner's *Brady* claims, trial counsel conflict of interest claim, the ineffective assistance of counsel claim, and those claims already addressed by the Court in previous orders. The Court concludes that Petitioner's *Brady* claims, and conflict of interest claims, are without merit, and they are dismissed.

With respect to Petitioner's ineffective assistance of counsel claim, the Court concludes that Petitioner received ineffective assistance of counsel during the sentencing phase of his trial, and therefore, Petitioner's petition for a writ of habeas corpus relief is granted as to that claim. Accordingly, the Court vacates Petitioner's sentence of death, and remands this case to the State of Tennessee for further proceedings not inconsistent with this opinion. As noted above, Petitioner is also serving two consecutive life terms for assault with intent to commit murder and armed robbery and shall remain incarcerated.

It is so ORDERED.

---

**42.** For example, Nancy Lancaster, Sarah Roberts Walton, Robert Sadoff, Diana McCoy, Kris Sperry, Raymond Winbush and Brian Stephenson were not called as witnesses in the state post-conviction proceeding.